IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ARTHUR CERECEDES,

        Plaintiff,

vs.                                No. CIV 06-902 MCA/LFG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

        Defendant.

### MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

    Plaintiff Arthur Cerecedes ("Cerecedes") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g) seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner"). The Commissioner determined that Cerecedes was not eligible for disability

insurance benefits ("DIB) or for Supplemental Security Income benefits ("SSI"). Cerecedes moves

this Court for an order reversing the Commissioner's final decision and remanding for an immediate

award of benefits or, in the alternative, for a rehearing.

    Cerecedes was born on February 25, 1962 and was 43 years old at the time of the

administrative hearing in November 2005. [Tr. 416]. He completed the 11th grade and obtained his

G.E.D. [Tr. 416]. He previously worked as an electrician's helper, an armored transport

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

driver/messenger, a school bus driver for handicapped children, an asbestos worker. [Tr. 60, 68, 101, 416-420].

Cerecedes claims disability based on a cardiac condition, pain in his legs, and mental impairments including depression, sleeping difficulties and poor concentration. [Doc. 15, at 3]. He applied for DIB and SSI in September 2004, alleging an onset date of September 16, 2004. [Tr. 15]. Cerecedes's application for benefits was denied at the initial and reconsideration stages, and he sought timely review by an Administrative Law Judge ("ALJ"). An administrative hearing was held before the ALJ on November 22, 2005. [Tr. 393-411; 412-34].[2]

In a written decision dated May 24, 2005, the ALJ found that Cerecedes was not disabled within the meaning of the Social Security Act and denied his application for benefits. [Tr. 12-22].Cerecedes challenged this determination to the Appeals Council which denied his request for review on September 14, 2006. [Tr. 6-9]. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the

---

[2]The transcript at pages 393-411 contains numerous instances noting only "inaudible." In addition, the transcript inexplicably identifies the vocational expert as "Ms. Carmichael [phonetic]" when the expert's correct name is Pamela Bowman. A corrected transcription of the hearing was later certified and submitted by the Commissioner; that copy appears at pages 412-434. When the Court cites to the hearing transcript, the citations will be to the corrected version. The Court notes, however, that while the corrected transcript is an improvement, it also contains a number of "inaudible" instances.

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2007); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five.  If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are:  at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (2007);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, he is capable of performing other work.[10]   If the Commissioner proves other work exists which the claimant can perform, the claimant is given the

---

[4]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2007); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. §§ 404.1520(b), 416.920(b)(2007).

[6]20 C.F.R. §§ 404.1520(c), 416.920(c)(2007).

[7]20 C.F.R. §§ 404.1520(d), 416.920(d) (2007).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [him or her] from doing any gainful activity."  20 C.F.R. §§ 404.1525(a), 416.925(a) (2007).

[8]20 C.F.R. §§ 404.1520(e),(f), 416.920(e),(f) (2007).

[9]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2007).

[10]20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

chance to prove he cannot, in fact, perform that work.[11]   In the case at bar, the ALJ made the

dispositive determination of non-disability at step five of the sequential evaluation.

Cerecedes contends that the final administrative decision is not supported by substantial

evidence, that the Commissioner did not carry his burden of proof, and that the Commissioner did

not apply the correct legal standards.

## Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited.  Hamilton v.

Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function

is to consider whether the Commissioner's final decision is supported by substantial evidence, and

whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983 (10th Cir.

1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept

it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a

preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described,

for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must also discuss the uncontroverted evidence
> he chooses not to rely upon, as well as the significantly probative
> evidence he rejects.  (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.  The Court can neither re-weigh the evidence nor substitute its judgment for that of the

---

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Cerecedes claims that the ALJ erred in that her RFC finding is contrary to the evidence; her credibility finding is deficient; and her ruling that Cerecedes was capable of performing three specific jobs identified by the VE was flawed.  In addition, Cerecedes complains that the transcript of the administrative hearing was so defective, with its many designations of "inaudible," that review by this Court is impossible.

## Discussion

### The ALJ's Five-Step Analysis

Step One.  The ALJ found, at Step One, that Cerecedes had performed substantial gainful activity after September 16, 2004, his alleged onset date.  She states that Cerecedes testified that he has not worked since June 4, 2004 and that this testimony is inconsistent with documentary evidence showing no income since 2003.  The ALJ then states in her opinion, "This suggests that Mr. Cerecedes did not report earned income thereafter [*i.e.,* since 2003], despite working."

The transcripts of the hearing, however, establish that Cerecedes actually testified that he stopped working in January 2004  [Tr. 396-397, 416, 419-20].[12]  He said the same thing in various documents submitted to the Social Security Administration in connection with his application for benefits.  [*See*, Tr. 60, 68].  A date of January 2004 would be consistent with no income reported "since 2003," and does not reflect adversely on his credibility.

The ALJ also points to portions of the record which indicate that Cerecedes told a doctor on

---

[12] Although the first transcript at one point has the date as February 2004, this was changed to January in the second transcript.  The first transcript reads as follows:  "Q: Have you worked at all since February of '04?  A: No."  [Tr. 400].  The second transcript reads:  "Q: Have you worked at all since January or [sic] '04?  A: No."  [Tr. 419-420].

September 17, 2004 that he had been doing some light construction work three days earlier; and a notation by his doctor in October 2004 that Cerecedes stated he has a burning sensation that comes on when he is involved in construction projects.  The ALJ concludes that these statements are inconsistent with Cerecedes's assertion that he stopped working in June 2004.  Aside from the fact that the transcripts show that Cerecedes actually said he stopped working in January, not June, these statements by Cerecedes to his doctors do not establish that he worked in the construction industry, for pay, after January 2004.

In any event, the ALJ did not make an issue of the "substantial gainful activity" question at Step One, deciding instead to assume that Cerecedes ceased substantial gainful activity by mid-September 2004 and to proceed with the sequential analysis.  However, the Court notes these statements as they relate to the ALJ's finding on credibility, as will be discussed below.

Step Two.  At Step Two, the ALJ found that Cerecedes's combined cardiac conditions are medically severe, but that his left foot injury and mental impairment do not rise to the level of severe impairments.

Step Three.  At Step Three, the ALJ found that none of Cerecedes's impairments, singly or in combination, meets or equals any of the listed impairments.  The ALJ stated that she paid particular attention to Cerecedes's cardiac impairments.

Step Four.  At Step Four, the ALJ made her RFC finding.  She stated that although Cerecedes has shown that his impairments affect his work activity "more than minimally," she also found "not entirely credible" his assertions as to the extent of the limitations imposed by these impairments.  [Tr. 18].  She noted in support of her credibility finding that Cerecedes was advised by his doctor to quit drinking alcohol and quit smoking; and although he was able to stop drinking, Cerecedes "continued

6

to smoke through September 2005, with only occasional abstinence" and that "[t]his fact tends to undermine Mr. Cerecedes' claims of a disabling condition, as apparently, symptoms were not sufficiently severe to cause him to heed his doctor's advice." [Tr. 19].

The ALJ discounted Cerecedes' statements of chest pain, pointing to a doctor's statements in September and October that he was "stable" and that he told his doctor on one visit that he was feeling well and had plenty of energy. The ALJ also noted that, "Moreover, there is no contradictory evidence after October, 2005 that would preclude the residual functional capacity that I have determined." [Tr. 19]. She discounted Cerecedes' testimony that he cannot sit comfortably for more than 20-30 minutes without experiencing back pain, and his statement that he has to lie down several times each day because of fatigue and pain, finding that these complaints "are overstated in view of the objective medical evidence." [Tr. 19-20].

The ALJ found that Cerecedes had the RFC to lift and/or carry up to 10 pounds occasionally, and up to 10 pounds frequently, sit for a total of up to six hours, stand and/or walk for a total of up to two hours, and can push and pull with the upper and lower extremities in a manner consistent with the strength limitations stated. She added that he should never climb ropes, ladders, and scaffolds, but can climb ramps and stairs occasionally, and balance, stoop, kneel, crouch, and crawl occasionally. He must avoid exposure to unprotected heights. [Tr. 20]. This RFC falls within the physical exertion category of sedentary work, 20 C.F.R. §§ 404.1567(a), 416.967(a); and the ALJ found that Cerecedes has additional non-exertional limitations which reduce the range of sedentary work he can perform. [Tr. 21].

Having established this RFC, the ALJ found that Cerecedes cannot perform his past relevant work, all of which was performed, at least, at the medium physical exertion level. [Tr. 20].

Step Five.  At Step Five, the ALJ found that the Commissioner had met his burden of showing there are jobs existing in substantial numbers in the national economy which Cerecedes is able to perform, and thus that Cerecedes  is therefore not disabled within the meaning of the Social Security Act.  The ALJ considered Cerecedes' age, education, and vocationally relevant past work experience and found that he did not have any transferable skills from his past relevant work.  Using the Medical-Vocational Guidelines as a framework, and considering the testimony of the Vocational Expert, the ALJ found that Cerecedes was capable of performing the following unskilled, sedentary occupations:

Escort, Account Clerk, and Gaming Monitor.

### RFC and Credibility Findings

Cerecedes faults the ALJ's RFC finding, as well as the finding regarding credibility.  These two findings are related, and the Court agrees that in an otherwise thorough and well-reasoned opinion, the ALJ's conclusion as to RFC and credibility is inconsistent with the record, and the case must be remanded for a rehearing.

As noted above, the ALJ discounted Cerecedes's accounts of chest pain, leg pain and fatigue, finding them not entirely credible in light of the medical record.  She noted Cerecedes's history of doctor visits and hospitalizations associated with his coronary artery disease, but she discounted his statements of recurrent chest pain, relying on one or two doctor visits in which Cerecedes either told doctors that he was feeling fine that day, or else the doctor noted in the medical record that Cerecedes did not feel chest pain at that time.  [Tr. 19].

In addition, the ALJ stated that Cerecedes's statement that he cannot sit comfortably for more than 20-30 minutes without back pain, and his complaints of fatigue were not supported by objective medical evidence.  [Tr. 19-20].  These conclusions led her to assign the RFC as described above.

8

In addition, the ALJ implied that Cerecedes is generally not credible because, in her view, he did not report some income he earned in 2004.

Cerecedes contends that the ALJ erred in failing to consider the nonexertional impairments of fatigue, shortness of breath and pain – both cardiac pain and leg pain – in finding that he could do sedentary work. In particular, he contends, the ALJ failed to consider that these conditions make it impossible for him work full time, on a regular and continuing basis. The record regarding these nonexertional impairments is as follows.

A.  The Medical Evidence

The medical records submitted by Cerecedes begin in 2004; however, several references are made in the records to a myocardial infarction ("MI"), or heart attack, which he suffered in 2001. At that time, he was hospitalized and a stent was placed to keep one of his right coronary arteries open. [*See*, Tr. 110, 162, 284]. Cerecedes told a doctor in September 2004 that he stopped taking his medications within a month of his discharge from the hospital in 2001, and that he had not had any symptoms or any medical follow up in the three years since that time. [Tr. 110, 113].

On September 16, 2004, the date Cerecedes lists as the onset of his disability, he was seen at the University of New Mexico Health Sciences Center ("UNMH") emergency room, complaining of pressure in his chest accompanied by difficulty in breathing, palpitations, and diaphoresis (profuse perspiration). [Tr. 110]. He told the doctor he first noticed the symptoms, including shortness of breath, fatigue and some nausea, when doing some light construction work a few days earlier. He said the symptoms progressively got worse until that morning when, he had developed chest pain radiating to his left shoulder and neck. He described the pain as a burning, tingling, or numbness sensation, unlike the symptoms he experienced in 2001 when he had his first MI. He also reported

that he could walk only a maximum of 10 feet before symptoms of fatigue and labored breathing would force him to stop.  He reported smoking 2-3 packs of cigarettes a day for the past 30 years. Both his father and brother had MIs in their 30s; his father had a 4-vessel coronary artery bypass graft at the age of 38.  [Tr. 110-111].

The ER doctor found no chest discomfort at the time of the examination, and no palpitations. Cerecedes's heart rate was excessively rapid, and a systolic murmur could be heard.  [Tr. 111].  A chest x-ray was taken which showed a normal heart and lungs, with no acute cardiopulmonary disease noted.  [Tr. 155-156; 111].  Electrocardiograms ("EKG"s) and an echocardiogram showed an abnormal left ventricle and moderate aortic regurgitation, with "irregularly irregular" heart rhythm consistent with atrial fibrillation.[13]  [Tr. 111, 147-149, 151-152].  Cerecedes was treated with medications to control his heart rate and was admitted to the Cardiology Service at the hospital.  [Tr. 111].

Cerecedes was discharged on September 22, 2004.  During his stay, several different medications were adjusted and/or ordered for relief of his symptoms.  He exhibited an allergy to one of these medications.  [Tr. 113].  The discharging physician explained to Cerecedes the "paroxysmal nature" (meaning suddenly recurring or intensifying) of his atrial fibrillation condition, and the importance of continued used of anticoagulants such as Coumadin due to his risk factors for stroke, including hypertension, severe left ventricular hypertrophy (*i.e.*, enlargement), and aortic

---

[13]Atrial fibrillation is defined as "atrial arrhythmia characterized by rapid randomized contractions of the atrial myocardium, causing a totally irregular, often rapid ventricular rate."  An atrium is a cavity of the heart, as is a ventricle; myocardium means heart muscle.  Dorland's Illustrated Medical Dictionary, 26th ed. (1981), at 136, 499, 861, 1449.  "Aortic regurgitation" refers to the backflow of blood from the aorta into the left ventricle, owing to imperfect functioning of an aortic valve.  Id., at 1140.  All further medical definitions in this opinion are taken from the above-noted dictionary, and it will not be cited in each instance.

regurgitation.  [Id.].

During this hospital visit, laboratory tests showed some abnormal liver function.  Cerecedes told his doctor that he "has had problems for many years with alcohol use," and he was advised to quit drinking, particularly since he was taking Coumadin.  He declined substance abuse counseling at that time.  [Tr. 113].  The discharging physician noted that Cerecedes has "quite refractory hypertension," and he was started on three separate medications for this.  [Tr. 114].

On discharge, Cerecedes was given an appointment to see Dr. Jonathan Abrams in the UNMH Cardiology Clinic for follow up, and he was referred to the Coumadin Clinic and cardiac rehabilitation.  [Tr. 114].

Cerecedes returned to see Dr. Abrams on September 26, 2004.  Dr. Abrams noted that the EKG taken during Cerecedes's recent hospitalization showed essentially normal results, although it also showed the old infarction.  The echocardiogram showed a marked left ventricular enlargement and "moderate to moderate-plus" aortic regurgitation.  Cerecedes told that doctor that since his discharge, he "has felt reasonably well but tires easily."  [Tr. 122].  He complained of intermittent sharp chest pain and a substernal burning sensation that comes on when he is involved in construction projects.  He walked on a treadmill in the Rehabilitation Unit without difficulty.  [Id.].

Dr. Abrams noted that Cerecedes's mother, now in her mid-80s, had undergone heart surgery in 2001 for a condition known as IHHS, or idiopathic hyperkinetic heart syndrome.  He stated further in his notes that "Mr. Cerecedes is a most interesting patient.  It appears that he has several different cardiac conditions, including obstructive coronary artery disease (history of myocardial infarction and stent placement . . .; hypertrophic cardiomyopathy [a general term meaning a disease of the heart muscle] which may be familial; and aortic regurgitation.  Three cardiac conditions do not seem to be

11

related as best I can tell." [Tr. 122]. Dr. Abrams decided to do a work-up on Cerecedes's heart disease and ordered a stress test. [Id.].

As noted above, Cerecedes cites September 16, 2004 as his onset date, and he filed his initial application for disability benefits on September 30, 2004.

The medical records indicate that Cerecedes had numerous appointments for medication adjustment or medication education between September and December of 2004. [Tr. 124-125, 129-146, 182-207]. There is no indication that he missed any of these appointments, or failed to take his prescribed medications during this period.

At one of his follow up visits on November 16, 2004, Cerecedes was supposed to have taken a treadmill test, but he was unable to walk long enough to reach the target heart rate. He experienced leg cramps, weakness, shortness of breath, and chest pain. His symptoms resolved with rest. [Tr. 178-179]. The results of the nuclear images obtained during this test showed no evidence of MI or ischemia (deficiency of blood to a site caused by constriction or obstruction of a blood vessel), but did show a dilated  left ventricle and aortic regurgitation. [Tr. 212-213].

On November 23, 2004, Cerecedes was seen at UNMH for complaints of leg pain. He told the examining physician, Dr. David Anderson, that when he exercised he experienced an intermittent burning sensation in his calf muscles in both legs, with the pain extending to his thighs. He said further that his exercise tolerance is approximately 20-30 yards before he begins to feel these sensations, that he first noticed the symptoms in September, and that they had been getting progressively worse. The symptoms were relieved with rest. [Tr. 174].

At this visit, Cerecedes also complained of two episodes of sharp chest pain over the preceding four months, both occurring while he was walking to his mother's house. These episodes

lasted for approximately one hour and were relieved by nitroglycerin.  He reported no other symptoms of heart attack, including shortness of breath, nausea, vomiting, palpitations, or arm or jaw radiation.  [Id.].  Cerecedes also reported having headaches in the early morning, chronic in nature, that are relieved by "popping my neck," pain in his left foot related to an old gunshot wound, and fatigue since February, which Cerecedes thought was related to his atrial fibrillation condition.  [Tr. 174-175].  The doctor noted that Cerecedes was a smoker but was willing to quit.  Cerecedes also reported that he had been a heavy alcohol user in the past, but that he quit drinking in September. [Tr. 174].

In his notes of this visit, Dr. Anderson uses the term "claudication" in reference to Cerecedes's leg pain symptoms.  This term is defined as limping or lameness.  "Intermittent claudication" is defined as:

> a complex of symptoms characterized by absence of pain or discomfort in a limb when at rest, the commencement of pain, tension, and weakness, after walking is begun, intensification of the condition until walking becomes impossible, and the disappearance of the symptoms after a period of rest.  The condition is seen in occlusive arterial diseases of the limbs . . . .

Dr. Anderson approach to the possible claudication problem was to order a laboratory test called an ankle brachial index to determine whether Cerecedes had a circulation problem in his legs. The doctor also counseled Cerecedes to stop smoking and enrolled him in the Smoking Cessation program at UNMH.  The doctor started Cerecedes on a vasodilator medication but noted that he would likely receive the most benefit from smoking cessation and aggressive blood pressure and cholesterol management.  [Tr. 176].  Cerecedes's blood pressure and cholesterol readings were both elevated at this visit, and the doctor adjusted his medications.

Four days later, on November 27, 2004, Cerecedes presented at the UNMH emergency room complaining of sharp chest pains and chest pressure, similar to the symptoms he had experienced during his earlier MI.  Cerecedes also complained of shortness of breath when walking, as well as aching in his legs.  Upon arrival at the ER, his blood pressure was 210/90.  He told the doctor that he ran out of his blood pressure medication, couldn't afford to buy any more, and therefore hadn't taken the medications for four days.  [Tr. 162, 164].  The ER doctor, Dr. Abinash Achrekar, noted that Cerecedes had a history of heavy tobacco use, but that he "decided to quit today."  [Tr. 162].  A nitroglycerin drip was started, and Cerecedes's blood pressure came down.  He spent the night in the hospital.

Chest x-rays taken on the day of admission were negative for acute cardiopulmonary disease [Tr. 214-217], although one study showed a "somewhat tortuous ascending aorta."  [Tr. 216].  The doctor noted that the echocardiogram taken in September showed atrial fibrillation, with aortic regurgitation and hypertrophy.  The doctor wrote that the "[a]bnormal structure of the heart is concerning for a hypertrophic septal cardiomyopathy [which means, basically, an enlargement in certain structures of the heart].  In addition, he does have chest pain and shortness of breath and supraventricular tachycardia [excessive rapidity in the action of the heart] which all could be explained by his abnormal heart structure."  [Tr. 163].

Dr. Achrekar continued Cerecedes on various medications for his heart, blood pressure, and elevated cholesterol conditions and made an appointment for him to be seen in the Cardiology Clinic and the Coumadin Clinic.  [Tr. 163, 164].

On December 9, 2004, Cerecedes was seen in the Cardiology Clinic by Dr. Abrams, who noted the recent hospitalization for Cerecedes's blood pressure emergency, noting as well that there

14

was no indication of an MI at that time.  Cerecedes told Dr. Abrams that he had been feeling fatigue since that discharge, and that when he walks 10-30 feet, he develops what "may be called claudication" with an aching pain in the back of his thigh, going down to his calf, in both legs but with the left worse than the right.  [Tr. 242].  Cerecedes also told the doctor that he had quit smoking, as of two weeks ago.

Dr. Abrams noted that Cerecedes has had exertion-relations claudication-like symptoms for the past six months, progressively getting worse.  He added that Cerecedes "certainly has a risk factor profile that could result in premature peripheral vascular disease.  He already has premature coronary artery disease . . . ."  [Tr. 242].  Dr. Abrams arranged for Cerecedes to have Doppler studies done in the Vascular Lab to determine whether vascular disease might be causing his leg symptoms.  The Ankle-Brachial Index test done on December 13, 2004 was negative for any obstructive disease in his leg circulation.  [Tr. 247, 226-227].

Cerecedes was seen again by Dr. Abrams on January 31, 2005.  At that time, he had no cardiac symptoms and no further episodes of chest pain; however, the doctor noted that Cerecedes "continues to have a number of odd complaints" including back pain in the area of his kidneys, a burning sensation in both of his legs, and discomfort when he walks.  [Tr. 231].  Dr. Abrams noted that laboratory tests revealed no abnormality of blood flow in the legs, which "essentially excludes a significant peripheral vascular disease as a cause for his leg symptoms."  [Id.].  He adjusted Cerecedes's medications.

In a Disability Report dated February 2, 2005, Cerecedes stated that the pain and burning sensations in both legs had increased, as had his shortness of breath, and that his walking was limited by these conditions.  [Tr. 84, 88].

15

Cerecedes saw Dr. Anderson again on February 24, 2005 for a follow up visit regarding his muscle pain.  Cerecedes described constant burning in the front of both thighs and the backs of his calf muscles, exacerbated by walking and exercise.  He further said that his exercise tolerance is limited to about 50 feet by this burning sensation as well as shortness of breath.  The pain, he said, is chronic in nature and occurs at all times throughout the day, at a pain level of 6-7 out of 10. Cerecedes also complained of heart palpitations 2-3 times per day, without chest pain.  [Tr. 223].

Dr. Anderson noted that although Cerecedes had initially been diagnosed with claudication or peripheral vascular disease based on the burning sensation he described in his legs, the ankle-brachial test with its finding of normal circulation brought this diagnosis into question.  He suspected a possible reaction to medication as a cause of the symptoms, and ordered further tests to evaluate Cerecedes's electrolyte status.  Dr. Anderson refilled Cerecedes's prescription for blood pressure medication, which he had not been taking, and advised him to return in two weeks for a check of his blood pressure and electrolytes.  He also prescribed an antidepressant.  He said to return the ER if the palpitations did not resolve.  At this time, Cerecedes had not smoked since mid-December of the previous year.  [Tr. 224].

Between February and August 2005, Cerecedes returned to UNMH on numerous occasions, mostly for medication education and adjustments.  [Tr. 354-371].

Cerecedes was again hospitalized on April 14, 2005 and spent five days at UNMH.  He arrived complaining of chest pain for the preceding three days in the location of his left chest area, radiating to his left shoulder blade and arm, with associated difficulty breathing.  He said that the pain sometimes started at rest, but it worsened with exertion and never completed resolved.  Cerecedes also complained of palpitations over the past two or three months, which had been increasing in

frequency.  [Tr. 317].

An x-ray taken on April 14, 2005, the day of admission, showed an enlarged cardiac silhouette and aorta.  [Tr. 329-330].  A coronary angiogram taken on April 18, 2005, during the hospitalization, showed a lesion with stenosis (narrowing) in the left anterior descending artery, lesions in the left circumflex artery, and occlusion (obstruction) in the right coronary artery.  [Tr. 318, 325-328].  An echocardiogram taken on April 19, 2005 showed some thickening of the ventricular wall and mid-septum of the heart, and moderate aortic regurgitation.  [Tr. 318, 321-324].

The plan was to treat Cerecedes medically and work on risk-factor modification for prevention.  [Tr. 318, 327].  Cerecedes's cardiac medications were increased for more aggressive therapy, as were his blood pressure medications.  Following medication adjustments, he was able to walk in the hospital hallways without discomfort.  The Coumadin was restarted at discharge.  At this time, Cerecedes had apparently begun smoking again, as the doctor noted that he was counseled on tobacco cessation but did not express interest in quitting.  [Tr. 318].  Cerecedes was discharged on April 19, 2005.

Cerecedes was next seen at UNMH on May 10, 2005 for a follow up visit after his discharge on April 19.  Cerecedes told CFNP Rebecca Mayo that he had been dizzy and experienced nausea and increased depression since his discharge.  He felt claustrophobic and worried about his health. He continued to have palpitations and chest pain, along with frequent headaches, muscle aches, and swelling in the legs.  He had quit smoking again.  [Tr. 315].

Mayo felt that Cerecedes's depressed mood might be related to the beta blocker medication he was taking and she prescribed antidepressants, not only for the depression but also to help Cerecedes in his efforts to stop smoking.  She noted that he had a history of stopping smoking but

17

then resuming.  Mayo referred Cerecedes to the Cardiac Rehabilitation clinic for help with his blood pressure, which remained high.  She advised him to return to the ER if he experienced further symptoms of chest pain or shortness of breath, or if he needed to use nitroglycerin.  [Tr. 315-316].

In a Disability Report dated May 10, 2005, which Cerecedes submitted in connection with his Reconsideration request, he stated that his chest pain and burning leg pain had increased, that he felt tired all the time, and that he suffered from shortness of breath and headaches.  He stated that he could not walk far without rest periods and could not bend or lift.  [Tr. 91].

Cerecedes was seen again by Dr. Abrams in the Cardiology Clinic on July 25, 2005.  The doctor noted that the coronary angiogram done on April 18 "revealed significant but not obstructive lesions in at least two coronary arteries," and occlusion of another coronary artery.  [Tr. 313].  At this visit, Cerecedes reported progressively worsening crushing chest pain which came on only with walking or physical activity.  He also reported severe chronic left arm and leg pain – it was not mere superficial muscle pain, he said, but rather something more "deep down."  [Id.].

In his notes of this visit, in a section labeled "Comments," Dr. Abrams wrote, "This is a difficult patient.  I suspect there is a background of depression."  The doctor noted also that he felt Cerecedes would not be given disability benefits, as "there are no objective signs of myocardial ischemia [deficiency of blood to the heart tissue, due to functional constriction or actual obstruction of a blood vessel]."  He ordered further nuclear tests to determine whether there is any ischemia in the area of the left anterior descending artery and, "[i]f he has a normal scan as before, we will have to conclude that his chest discomfort is not related to obstructive coronary disease."  [Id.].

Dr. Abrams thought it possible, though not likely, that Cerecedes's arm and leg pain might be caused by the Lipitor medication he was taking for his high cholesterol, and he advised Cerecedes

to stop the Lipitor for four weeks, as a test.  The doctor also ordered a cardiac scan, and noted that it might be useful to send Cereceedes to the Pain Clinic "to see if there are any useful thoughts."  [Id.].

A cardiac scan was done on August 12, 2005.  Although there were some abnormalities, the results of the scan showed no MI and no reversible ischemia.  [Tr. 307-308].  Cereceedes also underwent a stress test on that date; he experienced shortness of breath, arm pain, and chest discomfort during the test.  [Tr. 309-312].

Other than the August 12 cardiac scant, there are no medical records between the July visit to Dr. Abrams and Cereceedes's next hospital stay in September 2005.  Cereceedes presented to the ER at UNMH on September 8, 2005 complaining of two different types of chest pain, a right-sided pain which radiated to his back, and a squeezing chest pain that was on the left, substernal, and which radiated to his left arm.  He said the pain was accompanied by severe perspiration and a feeling that he couldn't catch his breath.  His blood pressure was extremely high on admission.  Cereceedes said that he experienced fairly consistent chest pain with physical exertion such as walking 20 to 30 feet, but up until the night prior to admission, he did not have chest pain when at rest.  [Tr. 284].

The ER doctor, Dr. John Maylard, suspected "aortic dissection" due to Cereceedes's description of the right chest pain, and because Cereceedes's blood pressure was different in the left and right arms.  However, aortic dissection was ruled out on a CT scan of the chest.  Testing of Cereceedes's cardiac enzymes ruled out an acute MI, and he was deemed to have unstable angina (thoracic pain with a feeling of suffocation and impending death, due to lack of oxygen to the heart muscle and precipitated by effort or excitement).  He was also given an EKG on admission, which showed some abnormalities.  [Tr. 284-285, 301-304].  On September 12, 2005, Cereceedes underwent a cardiac catheterization, which found a lesion in the left anterior descending artery, and a stent was

placed in that artery.  [Tr. 297-300, 285].

On September 15, 2005, Cerecedes underwent several tests.  A cardiac scan showed an infarct, but with no evidence of surrounding reversible ischemia.  [Tr. 291-292].  A treadmill test was begun, but Cerecedes could only maintain the exertion for 2 minutes, 35 seconds.  He had to stop due to sudden chest pain and pressure.  [Tr. 287-288, 295-296].  A stress test was completed later that day, which Cerecedes tolerated well, with a bit of chest pressure.  No significant findings resulted from the test.

The alarmingly high blood pressure which Cerecedes displayed upon admission was controlled with a nitroglycerin drip during his hospital stay, and he was also "anticoagulated" during the stay.  Cerecedes was discharged on September 15, 2005 all of his home meds.  He was re-started on Lipitor for his high cholesterol.   He was advised to stop smoking, to return to the hospital for any further episodes of chest pain or shortness of breath, and to follow up with the Cardiac Clinic and with his primary care physician.  [Tr. 284-285].

Cerecedes was seen again at UNMH for a follow up visit on September 21, 2005.  He was examined by Dr. Pamela Hope, who noted that the stent Cerecedes received on September 12 was placed in order to correct a 90% stenosis (narrowing) in his left anterior descending artery.  Cerecedes told Dr. Hope at this visit that he still had chronic chest pain every day, and that it was worse with exertion but did occur at rest.  The pain would typically begin on the left and radiate to his left arm.  It was sometimes associated with nausea, shortness of breath and profuse perspiration.  The pain never went away and could only be relieved with nitroglycerin and/or morphine.  Cerecedes reported at this visit that he continued to smoke cigarettes.  Dr. Hope found Cerecedes's symptoms consistent with unstable angina and ordered an EKG.  [Tr. 282].

On October 6, 2005, Cerecedes visited the Cardiology Clinic and was examined by CNS Renee Manring-Day. He told Ms. Manring-Day that he had been feeling much better since he had the stent put in. Although he occasionally felt what he described as "fibrillation" in his chest, with shortness of breath, he said this only lasted for seconds and did not occur as often as in the past. He said he quit smoking again in September 2005, and had not used alcohol since September 2004. In general, Ms. Manring-Day noted, Cerecedes stated "he is feeling well and has plenty of energy" [Tr. 279], although he did still experience achiness in his legs. She noted further that discontinuing Lipitor did not resolve these symptoms, and that the previous vascular study was negative for peripheral vascular disease. [Tr. 280].

There are no records of further medical visits until March 15, 2006, when Cerecedes was again seen by Renee Manring-Day, CNS at the Cardiology Clinic. Ms. Manring-Day wrote that Cerecedes had been hospitalized in February with chest pain that was intractable to nitroglycerin, that during this hospitalization he had a nuclear imaging study that showed no reversible ischemia and no significant change from the previous studies, and that he was discharged on long-acting nitrates to try and control his chest pain. [Tr. 385]. There is no documentation of this February 2006 hospitalization in the administrative record, although there is a reference in a medical record of March 21, 2006, noting that a "Cardiolite" test was done on February 16, 2006. [*see* Tr. 381].

In general, Cerecedes reported that he had been "not bad" lately and was feeling OK overall. He stopped smoking again one week before this visit and said he was not planning to start again. He was not drinking. He said he was getting exercise by walking 20 to 30 minutes every day. [Tr. 385-386]. Ms. Manring-Day noted that Cerecedes's coronary artery disease appeared to be stable at that point. He was instructed to use sublingual nitroglycerin if the angina returned. He was advised to

increase his exercise and to monitor his blood pressure.  [Tr. 385-386].

Six days after this visit at the Cardiology Clinic, Cerecedes presented again at the ER, complaining of chest pain for the past three days.  The pain was sharp, radiating to his jaw, shoulder and back.  He said it started when he was at rest watching television, increased with exertion, and had not gone away.  It was associated with shortness of breath and profuse perspiration.  At this visit, Cerecedes reported that he used to be a heavy smoker but that now he smokes 1-2 cigarettes a day. This was down from his earlier reports of 2 to 3 packs a day.  [Tr. 110].  He stated he does not use alcohol.  [Tr. 381].

A CT angiogram was done, which ruled out aortic dissection.  Cerecedes was started on a nitroglycerin drip and a beta blocker.  An EKG shoed no acute changes, but one of his cardiac enzyme tests was positive.  The doctor assessed him as having a myocardial infarction (heart attack), and she started him on various IV drugs.  His potassium levels were found to be abnormally low.  [Tr. 382-383].  It appears that Cerecedes was admitted to the hospital at this visit, as the doctor wrote that she would consider doing an emergent catheterization if the pain could not be controlled with medication.  However, there is no discharge summary for March 21, 2006 visit, and no further medical reports are found in the administrative record.

On March 30, 2006, Dr. Douglas Binder wrote a letter "To Whom It May Concern," stating that Cerecedes was taking Toprol XL for his heart condition, a medication commonly associated with tiredness and dizziness.  [Tr. 380].

B.  Standards for Determining RFC and Assessing Credibility

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuous basis – that is, eight hours a day for

five days a week, or an equivalent work schedule. "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is not the least an individual can do despite his limitations or restrictions, but the most. 20 C.F.R. §§ 404.1545(a), 416.945(a).

The RFC assessment must first identify the individual's functional limitations or restrictions, and assess his work-related ability on a function-by-function basis, including the functions listed in paragraphs (b), (c) and (d) of 20 C.F.R. §§ 404.1545, 416.946. When a claimant has a severe impairment not meeting the listings, the ALJ must consider the limiting effects of all of the claimant's impairments, even those that are not severe, in determining RFC. 20 C.F.R. §§ 405.1545(e), 416.945(e).

The ALJ is required to consider all symptoms, including pain, and the extent to which these symptoms are consistent with the objective medical and other evidence. 20 C.F.R. §§ 404.1529, 416.929. The ALJ must also take into account any medical opinions including statements from acceptable medical sources which reflect judgments about the nature and severity of the impairments and resulting limitations. 20 C.F.R. §§ 404.1527, 416.927.

The following factors are relevant in evaluating a claimant's complaints of pain: (1) objective medical evidence of an impairment that causes pain; (2) whether a loose nexus exists between the impairment and the subjective complaints of pain; and (3) whether the pain is disabling based upon all objective and subjective evidence. Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). In determining whether pain is disabling, the ALJ should consider the levels of medication and their effectiveness, how extensive the claimant's attempts have been to obtain relief from the pain, the frequency of

medical contacts, the nature of daily activities, subjective measures of credibility, and the consistency or compatibility of the non-medical testimony with objective medical evidence.  Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988).

In reviewing credibility determinations by the ALJ, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."  Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991).  However, the ALJ must explain why specific evidence relevant to each factor supports the conclusion that a claimant's subjective complaints are not credible.  Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not [be] just a conclusion in the guise of findings."  Huston v. Bowen, *supra*, at 1133.  So long as the ALJ sets forth the specific evidence relied on in assessing credibility, she need not conduct a formalistic factor-by-factor citation of the evidence.  White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2001).

C.  The ALJ's Credibility Finding and RFC Assessment Were Deficient

The ALJ found that Cerecedes could perform less than a full range of sedentary work.  She stated that although Cerecedes's impairments affect his work activity "more than minimally," nevertheless she found his assertions "not entirely credible" as to the extent of limitations that these impairments impose.

To explain her credibility finding, the ALJ pointed first to evidence that Cerecedes continued to work up until October 2004 which, she said, contradicts his claim to have stopped working in January of that year.[14]  The ALJ points in addition to the fact that Cerecedes did not report any

---

[14]As noted above, the ALJ incorrectly wrote in her opinion that Cerecedes claimed to have worked until June 2004.  This assertion may be a typographical error; in any event, it is unsupported by the record.  The record shows that the correct date is January 2004.

income after 2003.  The record indicates that Cerecedes was engaged in some sort of construction work a few days before his stated onset date, in September 2004.  He told his physician on September 17, 2004 that approximately two days earlier, he had a sudden onset of shortness of breath and heart palpitations accompanied by profuse perspiration and difficulty breathing "while the patient was doing some light construction work."  [Tr. 100].  Several weeks later, on October 26, 2004, he told a doctor that he gets what the doctor described as "a substernal burning sensation that often comes on when he is involved in construction projects."  [Tr. 122].

There is no indication in the record that Cerecedes was working for pay in September or October of 2004.  Being "involved in construction projects" and "doing some light construction work" could mean any number of things; he could have been doing some repair or remodeling work around his own home, or uncompensated work for friends or relatives.  If that were the case, the fact that he did not report any earnings from work in September or October 2004 does not establish that he was trying to avoid paying taxes.  It is purely speculative, based on this administrative record, whether Cerecedes was working for pay, or just working around his own house, or helping a friend. The record is silent in this respect.

By stating in October that he gets a burning sensation "when he is involved in construction projects," he could have been referring to the symptoms he felt at some point in the past, when he was actually engaged in construction work for pay.  Again, the record is unclear on this point, and it was error to assume from an unclear record that Cerecedes was trying to cheat the government by not declaring income and, therefore, lacked credibility.

Even if Cerecedes was doing some sort of "construction work" in the days just prior to the onset of his disability, or may have been doing some similar work even after the onset date, that does

not compel a conclusion of non-disability.  Occasional symptom-free periods, and even the sporadic

ability to work, are not inconsistent with disability.   Lester v. Chater, 81 F.3d 821, 833 (9th Cir.

1995); *see also*, Degan v. Barnhart,  314 F. Supp 2d 1077, 1087 (D. Kan. 2004):

> The performance of part-time work under these circumstances is
> hardly inconsistent with the plaintiff's testimony about his pain and its
> impact on his ability to work full-time. A claimant "need not prove
> that her pain precludes all productive activity and confines her to life
> in front of the television." Baumgarten v. Chater, 75 F.3d 366, 369
> (8th Cir.1996) (citation omitted). Evidence that a claimant engages in
> limited activities may be considered, along with other relevant
> evidence, in considering entitlement to benefits. Gay v. Sullivan, 986
> F.2d 1336, 1339 (10th Cir.1993). Trying to stay active through
> limited activities on those days when the pain is not as great is not
> substantial evidence of a daily activity level consistent with the ALJ's
> RFC finding.

The ALJ also points to Cerecedes's failure to completely stop smoking as a reflection on his

credibility.  She writes:

> Although Mr. Cerecedes quit drinking, he continued to smoke through
> September 2005, with only occasional abstinence.  This fact tends to
> undermine Mr. Cerecedes' claims of a disabling condition, as
> apparently, symptoms were not sufficiently severe to cause him to
> heed his doctor's advice.

[Tr. 19].

The record regarding Cerecedes's efforts to quit smoking is as follows.  On September 16,

2004, he told his doctor that he smoked 2-3 packs of cigarettes a day and had been doing this for the

past 30 years.  [Tr. 110].  At this visit, he also told the doctor that he had been a heavy drinker for

many years.  He was advised to quit drinking, particularly since he was taking the blood-thinning

agent Coumadin.  [Tr. 113].  On November 23, 2004, Cerecedes told a doctor that he was still a

smoker but was willing to quit.  By this time, he reported that he had quit drinking, as of the

preceding September.  [Tr. 174].

It appears that Cerecedes was able to follow his doctors' advice to quit drinking alcohol, but that it was much more difficult for him to quit smoking.  At the November 23, 2004 visit, his primary care physician strongly counseled him to quit smoking.  The doctor wrote in his notes that he had enrolled Cerecedes in a Smoking Cessation program at UNMH.  [Tr. 176].  At a visit to the ER a few days later, where he presented with complaints of sharp chest pain and chest pressure, he told the ER doctor that he was a heavy smoker but he "decided to quit today."  [Tr. 162].  At a medical visit on December 9, 2004, he reported that he had quit smoking, as of two weeks earlier.  One of the diagnoses at this visit was "nicotine addiction."  [Tr. 242].

In February 2005, Cerecedes reported to his primary care physician that he had not smoked since mid-December of the previous year.  [Tr. 224].  However, by April 14, 2005, he began smoking again.  At a hospital visit that day, the doctor noted that Cerecedes was counseled on smoking cessation but did not express interest in quitting.  [Tr. 318].  At this point, he seems to have relapsed into smoking and to have become discouraged about the possibility of quitting for good.

On May 10, 2005, a family nurse practitioner noted Cerecedes's history of quitting smoking for a time, but then resuming.  She prescribed an antidepressant, both for his symptoms of depression as well as to help him in his efforts to stop smoking for good.  [Tr. 315-316].  At a hospital visit in on September 15, 2005, Cerecedes was again counseled to stop smoking.  [Tr. 284].  He was still smoking cigarettes as of September 21, 2005 [Tr. 282] but by October 6, 2005, he had again quit smoking, and he reported again that he had been abstinent from alcohol since September 2004.  [Tr. 279].  However, he must have later resumed smoking, as he reported on March 15, 2006 that he'd stopped smoking as of one week earlier and did not intend to start again.  [Tr. 385].  On March 21,

2005, however, he stated that he used to be a heavy smoker but now smoked only 1-2 cigarettes a day.  He continued at that time to be abstinent from alcohol.  [Tr. 381].

This is a classic portrait of a person addicted to tobacco who makes good faith efforts to quit smoking but repeatedly returns to the habit.  Cerecedes was able to quit drinking in spite of very heavy alcohol use in the past.  Prior to the time he stopped drinking, he told his doctor he drank approximately "half a case per week" – half a case of what, the doctor doesn't say – and that he had done so for about 20 years.  [Tr. 174].  But he was ultimately able to stop his alcohol use and abuse.  Tobacco use was clearly a much more difficult challenge for Cerecedes, but the record shows that he was warned of its adverse effects on his health and that he made diligent attempts to stop smoking.

The Government argues in its briefing that it is appropriate for an ALJ to consider the fact that a claimant fails to comply with his doctor's orders, in evaluating the validity of his alleged impairments and in making the determination that the claimant is not disabled.  While this may be true, it was improper for the ALJ to cite Cerecedes's inability to stop smoking as a factor in determining *credibility*.  She writes that his continued smoking indicates that his "symptoms were not sufficiently severe to cause him to heed his doctor's advice."  [Tr. 19].  This approach has been soundly rejected:

> [T]he ALJ erred in relying on her failure to quit smoking as evidence of non-compliance and as a basis to find her incredible. We note that even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful. Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer-directly caused by smoking-who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the

28

> addictive nature of the product impacts their ability to stop. This is an
> unreliable basis on which to rest a credibility determination.

Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000).

See also, Banks v. Apfel, No. 98-4214-SAC, 2000 WL 1863382, at *14 (D. Kan. Nov. 13, 2000) ("In short, the ALJ erred in judging Banks' credibility relying on his failure to stop smoking").

As the court said further in Shramek v. Apfel, supra, where the reasons give by the ALJ "do not build an accurate and logical bridge between the evidence and the result," the determination cannot be upheld. Id., at 811. There is no "logical bridge" between Cerecedes's failure to triumph over an addictive habit despite multiple attempts, and the credibility of his assertions as to the extent of his limitations. The doctors also advised him to quit drinking, and he was able to do so. The fact that he could not also quit smoking does not reflect adversely on his credibility, and it was error for the ALJ to so hold.

The record is clear that Cerecedes suffers from abnormalities in his heart structure and functioning which have resulted in heart attacks, hospitalizations, and a second surgical stent placement during the relevant period. These are all objective findings. There are consistent and repeated reports throughout the record that Cerecedes suffers from sharp, burning, and crushing pain in his chest, palpitations, and shortness of breath, particularly upon exertion. At various points in the record, Cerecedes's doctors state that he is an "interesting patient" or a "difficult patient." This seems to be based on the fact that he seems to have several different heart conditions which may well be completely unrelated but which seem to combine to produce uncomfortable and painful symptoms.

Cerecedes also reported on numerous occasions that he suffers from a burning pain in his legs upon walking. The doctors suspected that he had peripheral vascular disease, which might have

explained these symptoms, except that the diagnosis was not confirmed by laboratory tests.  The fact that the doctors have not yet been able to determine what is causing these symptoms does not mean the symptoms do not exist, or that Cerecedes is creating them out of whole cloth.  Cerecedes sought help and relief for the leg problems numerous times during the relevant period, and his description of the symptoms he was experiencing was consistent each time.

Cerecedes also says that he suffers from fatigue and thinks this may be caused in part by his medications.  One doctor submitted a letter confirming that the medication Cerecedes is taking for his heart condition can lead to dizziness and fatigue.  Cerecedes stated at the hearing that he cannot sit for very long before his back begins to hurt and the burning sensation starts up in his legs.  He said that he cannot get through a day without taking a break and lying down to rest.  [Tr. 426-427].

The ALJ did not fully credit Cerecedes's statements that his heart conditions, burning pain in his legs, and his fatigue limited his ability to work to the extent he alleged.  Her RFC finding that Cerecedes could sit for a total of up to six hours and stand or walk for a total of up to two hours could only have been made if she discounted the credibility of his consistent statements to the contrary.

In addition, the VE appears to have conceded that there would be no jobs that Cerecedes could perform, if his need to rest frequently during the day were added to the hypothetical; the answer was actually, "He would not be able to maintain [INAUDIBLE]."  [Tr. 433].  The Court notes that in determining RFC, the ALJ must make a finding as to the ability to perform work activity on a regular and continuing basis.  20 C.F.R. §§ 404.1545(b), 416.945(b).  If Cerecedes cannot perform the job duties as an escort, account clerk, or gaming monitor on a "regular and continuing basis," due to fatigue, these jobs are not available to him.

It appears that the ALJ made the finding that Cerecedes could work as an escort, account clerk, or gaming monitor, because she discounted his credibility as to fatigue.  The ALJ did not give any specific reason for disbelieving Cerecedes with regard to his assertions as to fatigue.  As discussed above, the general notion that Cerecedes was not credible due to an alleged failure to report earned income is not supported by the record; and the fact that his attempts to quit smoking completely were not successful is not a valid reason for discounting his credibility.

Cerecedes also points to the fact that the three jobs cited by the ALJ in her opinion, particularly the "surveillance monitor" or "gaming monitor" position, do not correspond with the jobs which the VE testified Cerecedes could perform.  He also notes that the transcript is full of omissions, and the Court itself noted significant differences between the first and second versions of the hearing transcript.  While these problems and inconsistencies do not in themselves provide ground for reversal, Ward v. Heckler, 786 F.2d 844, 848 (8th Cir. 1986), they do tend to raise questions as to the validity of the outcome of this case and are further indication that a rehearing should be undertaken, to ensure that justice is done in this case.

The Court finds that the case should be remanded for a rehearing, in which the ALJ should pay particular attention to the credibility determination and the RFC finding, bearing in mind that RFC is the ability to perform work activity "on a regular and continuing basis."

### Recommended Disposition

That Cerecedes's Motion to Reverse and Remand [Doc. 14] be granted, and this matter be remanded for a rehearing so that the ALJ can address the issues described above.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge